# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**DONNA GAIL THOMPSON,**

     **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 2:16-CV-09790**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social

Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II

and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C.

§§ 401-433, 1381-1383f. By Order entered October 19, 2016 (Document No. 5.), this case was

referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence,

and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C.

§ 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on

the Pleadings. (Document Nos. 11 and 12.)

Having fully considered the record and the arguments of the parties, the undersigned

respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

judgment on the pleadings (Document No. 11.), **GRANT** Defendant's request to affirm the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

decision of the Commissioner (Document No. 12.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Donna Gail Thompson (hereinafter referred to as "Claimant"), protectively filed her applications for Title II benefits and for Title XVI benefits on July 21, 2014, alleging disability beginning June 19, 2014 due to "stomach pain, panic attacks, arthritis, chronic migraine headaches, anxiety disorder, depression, bronchitis, fibromyalgia, and bowel disorder". (Tr. at 289.) Her claims were initially denied on November 7, 2014 (Tr. at 143-153, 154-164.) and again upon reconsideration on March 17, 2015. (Tr. at 167-173, 174-180.) Thereafter, Claimant filed a written request for hearing on May 12, 2015. (Tr. at 181-182.) An administrative hearing was held on April 29, 2016 before the Honorable Toby J. Buel, Jr., Administrative Law Judge ("ALJ"). (Tr. at 37-96.) On May 24, 2016, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 15-36.) On July 22, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 13-14.) The ALJ's decision became the final decision of the Commissioner on August 17, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 7-12.)[2] On October 17, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 8 and 9.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 11.), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 12.) Consequently, this matter is fully briefed and ready for resolution.

---

[2] The Appeals Council resent the denial on August 25, 2016. (Tr. at 1-6.)

**Claimant's Background**

Claimant was nearly fifty-one years old when she filed her applications for disability, and would be defined as a "person closely approaching advanced age" by the Regulations throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(d), 416.963(d). (Tr. at 72.) Claimant graduated high school and previously worked as a medical receptionist at a hospital during the fifteen years prior to her alleged onset date. (Tr. at 74, 275.) Although she previously worked full-time at forty-hours per week, beginning in January 2014, she only worked three to four days per week before having to quit due to chronic stomach pain and nausea/diarrhea. (Tr. at 45, 275, 314.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2019. (Tr. at 20, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since June 19, 2014, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: chronic obstructive pulmonary disease (COPD); sinusitis; osteoarthritis/degenerative joint disease; rheumatism; headaches; fatty liver disease; erosive gastritis; diverticulosis; and hypoglycemia. (Tr. at 21, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 23, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity

("RFC") to perform medium work as defined in the Regulations

> except she should never climb ladders, ropes, or scaffolds. She should avoid all exposure to heights, moving machinery, and hazards. She is limited to frequent exposure to temperature extremes, fumes, odors, and dusts. The claimant would be afflicted with chronic pain noticeable to herself at all times but could maintain attention and concentration in two-hour increments with normal morning, lunch, and afternoon breaks. (Tr. at 25, Finding No. 5.)

At step four, the ALJ found that Claimant was capable of performing her past relevant work as a receptionist, and that this work did not require the performance of work-related activities precluded by her RFC. (Tr. at 29, Finding No. 6.) The ALJ then made an "**alternative**" finding at step five, given Claimant's age, education, work experience and RFC that other jobs exist in significant numbers in the national economy that she could perform based on the vocational expert's testimony, namely: hand packer; inspector; dry cleaner helper; price marker; cashier; and garment folder. (Tr. at 29-30.) The ALJ determined that Claimant had not been under a disability from June 19, 2014 through the date of the decision. (Tr. at 30, Finding No. 7.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant references several assignments of error in support of her appeal. First, she asserts that the ALJ erred when he did not give controlling weight to her treating physicians, Drs. Ronald Chattin and James Walker, and by failing to provide good reasons why he discounted their opinions. (Document No. 11 at 3.) Second, she contends that the ALJ did not "make a proper record" when he gave "controlling weight" to a reviewing doctor who chose to ignore objective test results when he reached his conclusions. (Id.) Third, Claimant argues that the ALJ failed to consider all her limitations when posing the hypothetical question to the vocational expert, and even though he stipulated to the restrictions found by Dr. Chattin, Claimant relied upon this stipulation to her detriment, because those restrictions precluded her from all work, and

furthermore, it was not included in the written decision.[4] (Id. at 3-4.) Fourth, Claimant argues that the ALJ made factual errors when he found she had no severe psychological impairment and that she received no psychological treatment when the record provided otherwise. (Id. at 5.) Fifth, Claimant states the ALJ erroneously found her less than fully credible when objective medical findings and the opinions of her treating physicians corroborated her testimony. (Id. at 6.) Finally, Claimant requests this Court reverse the Commissioner's final decision and award her benefits as of her onset date of June 19, 2014 or alternatively, remand this matter back to the ALJ to correct the errors below. (Id. at 8-9.)

In response, the Commissioner asserts that this case is determined solely upon the highly deferential duty ascribed to an ALJ in resolving conflicting evidence. (Document No. 12 at 1-3.) With respect to Claimant's treating physicians, the Commissioner argues that the ALJ's reasons for discounting their opinions is supported by substantial evidence, especially with regard to the check-box forms used to suggest Claimant had a mental impairment, because their opinions were inconsistent with the evidence of record, and failed to provide clinical evidence as required to support their opinions. (Id. at 12-13.) Additionally, the ALJ gave less than controlling weight to Claimant's treating physicians with respect to their opinions regarding her musculoskeletal conditions, again because they were largely inconsistent with the treatment records of evidence, including Claimant's own testimony, and further, the ALJ enlisted the help of medical expert Dr. Sklaroff to provide an opinion on the discrepancies. (Id. at 15-17.)

---

[4] The undersigned notes that this argument pertains to the discussion between the ALJ and Claimant's attorney about the physical limitations in Dr. Chattin's medical source statement that Claimant's attorney wished to add to the hypothetical to the vocational expert. (Tr. at 92-95.) Specifically, the ALJ stated: "You can send him, and I'll stipulate that any VE worth his salt with those limitations would say there's no jobs." (Tr. at 95.) Indeed, that is precisely what the VE testified to when asked what jobs would be available if he included the additional limitations found by Claimant's treating physician(s). (Tr. at 94.) This issue is more fully addressed infra, however, it would appear that Claimant's counsel misinterpreted what the ALJ was actually stipulating.

Next, the Commissioner contends that the ALJ did not ignore objective findings as suggested by Claimant, because the decision references several instances where the ALJ considered the results of objective testing as well as evaluated those results when fashioning the RFC, or Claimant's ability to work. (Id. at 18-19.) The Commissioner adds that just because Claimant had certain diagnoses supported by objective findings, she must also show a related functional loss or limitation; the testifying medical expert, who reviewed all the evidence of record, found no such limitations. (Id. at 19.) Moreover, the ALJ did not fail to consider Claimant's primary physical impairments, but evaluated them against the evidence and medical opinions of record. (Id. at 19-20.)

Next, the Commissioner states that contrary to Claimant's assertions otherwise, the ALJ properly considered the vocational expert's testimony, and was not bound by the extreme limitations found by Dr. Chatting's check-box form; those limitations were not supported by the record of evidence. (Id. at 20.) Further, the ALJ appropriately assessed Claimant's credibly-established limitations, for which the vocational expert opined that she was capable of her past relevant work. (Id.)

With regard to Claimant's argument that the ALJ erred by finding her mental impairments not severe, the Commissioner counters that this conclusion is supported by the evidence as well as the three opinions from mental health specialists; there was no sufficient evidence that Claimant could not work due to mental health issues. (Id. at 11.) The Commissioner also asserts that Claimant misinterprets the ALJ's noting that she did not seek psychological treatment: she did not seek such treatment from a provider specialized in mental health, not that she never received treatment. (Id. at 12.) Moreover, the ALJ performed the special technique mandated by the

Regulations with respect to her alleged mental impairments, none of which resulted in more than mild limitations in the four broad functional areas. (Id. at 13.)

Finally, the Commissioner points out that the ALJ is vested with the duty to reconcile the conflicting evidence of record as well as to make credibility determinations. (Id. at 14-15.) In short, the reality did not reflect Claimant's extreme version of her symptoms and resulting limitations. (Id.) In sum, the Commissioner states the ALJ's decision complies with the law, is supported by substantial evidence, and requests the decision be affirmed. (Id. at 20.)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records Relating to Gastrointestinal Impairments:

On August 28, 2013, Claimant presented to a health clinic with weakness, fatigue, dizziness, nausea and diarrhea. (Tr. at 570.) She stated that her symptoms were sudden, but had persisted for three and a half weeks. (Id.) She was assessed with acute sinusitis, NOS and prescribed antibiotics. (Tr. at 572.) Thereafter, follow-up treatment notes from October 2013 through December 2013 make no mention of diarrhea (Tr. at 418-420, 472-477, 534-536, 537-539, 540-543, 544-546, 547-550.) until Claimant presented for emergency treatment on January 23, 2014 with complaints of diarrhea, nausea, and abdominal cramping of "one day" duration. (Tr. at 421.) She was assessed with gastroenteritis. (Tr. at 423.)

On January 27, 2014, Claimant followed up with her family physician, Dr. Walker, and reported that her abdominal pain, diarrhea, and nausea had initiated seven days earlier. (Tr. at 554-

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

557.) Dr. Walker prescribed medications and clear liquids to rehydrate Claimant. (Tr. at 557.) On January 29, 2014, a CT scan of her abdomen and pelvis showed "[m]oderate inflammatory stranding bilateral perinephric fat planes" that "raise the question of pyelonephritis", diverticulosis, and fatty infiltrated liver. (Tr. at 470.); records further indicated that Claimant's diarrhea had "stopped" with use of Lomotil the day before. (Tr. at 462.) Claimant had a follow up appointment with her treating specialist, Dr. Bassam Haffar, on February 6, 2014. (Tr. at 407.) Claimant reported that medications had helped her nausea and that her diarrhea symptoms had moderated to 3 to 4 days/week; she was watching her diet, which also helped. (Id.) At another follow up appointment with Dr. Walker on February 12, 2014, Claimant reported that the pain in her abdomen was improving, and that she was watching her dietary intake (Tr. at 558.), however, she continued to have some cramping, vomiting, diarrhea and indigestion. (Tr. at 560.) It was noted that she was "in obvious pain." (Id.) Follow-up treatment notes in the record make little mention of GI issues, however, they depict mainly musculoskeletal complaints, a sore throat, and an ear ache. (Tr. 614, 634-641.)

On April 8, 2014, Claimant underwent an esophagogastroduodenoscopy with biopsy. (Tr. at 459.) The postoperative diagnoses included: duodenitis; multiple biopsies obtained; erosive gastritis; and small sliding hiatal hernia. (Id.) That same day, Claimant underwent a colonoscopy with biopsy; the rectum and colon were normal, aside from internal hemorrhoids observed. (Tr. at 460.) The subsequent pathology reports were unremarkable. (Tr. at 457-458.) On April 22, 2014, Dr. Walker ordered a renal ultrasound, and the result was normal. (Tr. at 456.)

Follow-up treatment notes from Dr. Haffar on May 29, 2014 indicate that Claimant still had abdominal pain, indigestion, no diarrhea, but occasionally vomiting. (Tr. at 403-404). On June

18, 2014, Claimant returned to her primary care physician, Dr. Chattin, endorsing abdominal pain, but no reports of vomiting or diarrhea (Tr. at 502-503.); Claimant was more concerned about her stress levels at that time and could "not afford a psych." (Tr. at 502.) A treatment note dated August 19, 2014 indicated that Claimant was using Robinul for her abdominal pain; she reported no abdominal pain, normal appetite, no diarrhea, but vomiting. (Tr. at 509.) She also used Lomotil as needed to control diarrhea. (Id.) Dr. Chattin prescribed Zofran for nausea and vomiting (Tr. at 510.); by her next appointment on August 21, 2014, Claimant reported no vomiting (Tr. at 575.), it was noted in the chart that Claimant's "IBS and chronic diarrhea several/month". (Tr. at 573.)

However, by December 8, 2014, due to persistent abdominal pain, nausea, vomiting, diarrhea and rectal bleeding, Claimant was seen by Dr. Ziad Salem instead of following up with Dr. Haffar. (Tr. at 739.) On February 4, 2015, Dr. Salem performed a colonoscopy/endoscopy on Claimant that showed only internal hemorrhoids, however several biopsies were taken. (Tr. at 761-762, 743.) Subsequent pathology reports were unremarkable but confirmed hemorrhoids. (Tr. at 762.) On March 2, 2015, Dr. Salem also performed an esophagogastroduodenoscopy that showed a normal esophagus, although gastritis was found in the antrum and two biopsies were taken, and ulcers were found in the duodenal bulb; as a result, Dr. Salem prescribed Claimant Nexium. (Tr. at 701, 718.) Subsequent pathology reports were unremarkable, but confirmed duodenal ulcers and gastritis. (Tr. at 720.)

On August 17, 2015, a HIDA scan indicated normal results. (Tr. at 631, 672.) On August 27, 2015, Claimant presented to the emergency room with complaints of epigastric abdominal pain symptoms that she reported began the week before and became worse and persistent just prior to her arrival. (Tr. at 617, 658.) She reported that she experienced these symptoms in the past a few

times, but they were not as painful. (Id.) She denied having diarrhea or vomiting, but endorsed nausea. (Id.) She was administered a "GI cocktail" to relieve her pain. (Tr. at 618, 659.) A CT scan of her abdomen and pelvis were taken that day, revealing no focal acute bowel abnormality, no appendicitis, and unremarkable bladder, kidneys, spleen, gallbladder, adrenal glands and pancreas, although "[t]here is diffuse fatty infiltration of the liver". (Tr. at 625-626, 666-667.) Claimant was diagnosed with peptic ulcer disease and abdominal pain. (Tr. at 619, 660.)

Evidence Relating to Musculoskeletal and Other Physical Complaints:

On May 13, 2014, Claimant saw Dr. Walker for a follow up appointment with complaints of weakness, sweating, shaking, tremor and decrease in vision that lasts temporarily and that she continued to have low back pain with right sciatica at times. (Tr. at 562.) It was noted that paresthesias described as "burning" on the bottoms of her feet. (Id.) Her physical examination showed bilateral upper and lower extremities and paraspinal musculature were intact with no atrophy, no defect and no lateral curvatures, although there was tenderness, antalgic posture and paraspinal muscle spasticity. (Tr. at 565.) She had limited side bending, flexion and extension, and positive straight leg raises. (Id.) She was continued on Paxil per her request as it "is doing well" and "no other complaints" were noted; she was to follow up in three months. (Id.)

A treatment note dated June 12, 2014 from Boone Memorial Hospital shows that Claimant presented to the emergency room with complaints of chest pain that began a week prior, but "does not radiate". (Tr. at 443.) It was noted that Claimant was at the hospital three days ago for a headache, for which she was given Fioricet and that it "resolved." (Id.) Claimant reported that last time she experienced the chest pain was six years ago, and that she drinks at least one energy drink per day and bottles of coke. (Id.) She was "negative for abdominal pain, acute changes,

constipation, diarrhea, vomiting" and back pain was "absent". (Tr. at 444.) X-rays of her chest were taken that revealed "no acute infiltrate" and that her heart and mediastinal structures were within normal limits. (Tr. at 451.) She was discharged in "good" condition and advised to "quit drinking so much caffeine and no more energy drinks." (Tr. at 445.)

A June 18, 2014 treatment note from Dr. Chattin indicated that an MRI of Claimant's back showed "bilateral facet hypertrophic joint changes at L5-S1." (Tr. at 502.) Her physical exam revealed normal motor strength and tone; her joints, bones, and muscles showed no contractures, malalignment, tenderness, or bony abnormalities and normal movement of all extremities; her extremities showed no cyanosis, edema, varicosities, or palpable cord; and she exhibited normal gait and station. (Tr. at 503.) On July 10, 2014, a treatment note from Dr. Chattin repeated that the MRI of Claimant's back showed "bilateral facet hypertrophic joint changes at L5-S1." (Tr. at 499.) The physical examination revealed normal tone and motor strength, no contractures, misalignments, or bony abnormalities in joints, bones and muscles, normal movement of all extremities and no cyanosis, edema, varicosities or palpable cord in her extremities, although she exhibited tenderness in her lower back and spine. (Tr. at 500.) Claimant's gait and station were normal. (Id.)

Claimant returned to Dr. Chattin on August 19, 2014 for follow up reporting that she was doing the same; it was noted, "I think she uses [R]obinul and is effective. She uses the [L]omotil as needed. She need[s] no refills." (Tr. at 509.) The physical examination showed that Claimant reported vomiting, but no abdominal pain, no diarrhea, normal appetite, no dyspepsia, however, she had difficulty urinating and incomplete emptying but no incontinence; she reported arthralgias/joint pain and back pain, but no muscle aches, no muscle weakness, and no swelling in

the extremities; she reported depression but no sleep disturbances. (Id.) She was "ambulating normally" (Id.) Her motor strength and tone were normal; no contractures, malalignment, tenderness or bony abnormalities in joints, bones and muscles with normal movement of all extremities; and no cyanosis, edema, varicosities or palpable cord in her extremities. (Tr. at 510.) Claimant's gait and station were normal. (Id.)

By August 21, 2014, Claimant saw Dr. Walker with complaints of low back pain that she rated an 8 out of 10 that radiated to her right leg. (Tr. at 573.) She also complained of chronic neck pain with radiation to her right arm/forearm. (Id.) It was noted that she "[h]as to walk with a cane at times." (Id.) She had positive straight leg testing on right. (Tr. at 576.) She was given refills for her prescriptions with instructions to return in three months. (Id.) A nurse's note indicated that Claimant complained of sleeping problems for "past two months. [Patient] states that she was in here for a walk in apt with Dr. Knapp in June[6] and he gave her 6 pills for a migrain[e] caffeine in them, but [patient] is unsure of the name of the pill, but would love to have an rx for these." (Tr. at 576-577.)

On October 20, 2014, an ultrasound of Claimant's right lower back was taken due to a "palpable lump", however, it was a normal exam, and no pathologies were demonstrated. (Tr. at 674.) Her pulmonary function study on October 23, 2014 was also normal. (Tr. at 496.)

By November 20, 2014, Claimant returned to Dr. Walker for her migraine headaches and low back pain. (Tr. at 582-583.) She also reported tingling, numbness and loss of sensation and focal weakness in her hands; she had an antalgic gait. (Tr. at 584.) Another positive straight-leg-raise test on the right was documented, as well as tenderness, limited side bending, limited flexion,

---

[6] (Tr. at 566-569.)

and limited extension. (Tr. at 585.) Her refills on prescriptions were renewed and she was instructed to follow up in three months. (Id.)

Treatment notes from October 20, 2015 indicate that Claimant "has had some problems with fibromyalgia and lumbar disc disease with sciatica." (Tr. at 640.) Dr. Walker noted that "[s]he does well as long as she takes her medicine for chronic pain, however over the last several days someone has gained access to her home and removed some of her Hydrocodone tablets." (Id.) Upon examination, Claimant exhibited a painful range of motion in her lumbar spine and positive straight leg testing on the right. (Tr. at 641.) Dr. Walker refilled her medicine for chronic pain, and wrote her prescriptions for nicotine patches to help her quit smoking; she was to return in three months. (Id.)

### Medical Records Relating to Mental Impairments:[7]

Most of the psychiatric treatment records submitted for the ALJ's review that concerned Claimant's treatment for depression and anxiety are from early 2015, and provided by her primary care physicians, Drs. Walker and Chattin. (Tr. at 642-645, 650-653, 769-771.) A treatment note dated April 27, 2015 indicated that Claimant had a depressed affect and was anxious; her thoughts and cognition were intact and she was oriented x3; she received prescriptions with instructions to return in three months. (Tr. at 653.) At her follow up appointment on July 27, 2015, Claimant reported that her anxiety and depression increased due to her medical condition preventing her from working and also due to struggle to obtain Social Security benefits. (Tr. at 645.) Dr. Walker

---

[7] Claimant submitted to the Appeals Council additional medical records from Dr. Daniel Thistlethwaite, dated October 6, 2011 and November 17, 2011; Dr. Thistlewaite began her treatment due to the referral from Dr. Chattin. (Tr. at 794-799.) Claimant did not reference these records or raise them in support of her appeal, and they were not part of the record at the time of the ALJ's review, however, Claimant advised DDS examiner Kelly Robinson, M.A. that she quit seeing Dr. Thistlewaite for mental health treatment because "it just seemed to make me worse." (Tr. at 490.)

increased her Cymbalta dosage and instructed to see her back within two months. (Id.)

Treating Physician Opinion Evidence:

Both Drs. Chattin and Walker provided a Medical Assessment of Ability to do Work-Related Activities (Mental) and (Physical) on behalf of Claimant. (Tr. at 776-778, 779-782, 783-786, 787-789.) Dr. Chattin's mental medical source statement dated March 25, 2015 indicated that Claimant had poor capabilities of dealing with the public (Tr. at 776.), of interacting with supervisor(s), of dealing with work stresses, and maintaining attention/concentration. (Tr. at 777.) Dr. Chattin also opined that Claimant had poor ability to understand, remember and carry out complex job instructions or even detailed job instructions. (Id.) He believed Claimant had poor abilities in maintaining her personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, or demonstrating reliability. (Tr. at 778.) Dr. Chattin opined that Claimant's "panic-anxiety; major depression" supported these assessments. (Id.) He did believe she was capable of managing benefits in her own best interests. (Id.)

That same day, Dr. Chattin also provided a physical medical source statement, and opined that Claimant was limited to lifting/carrying less than 10 pounds occasionally and less than 10 pounds frequently due to her lumbar radiculopathy, rheumatism, lumbar facet syndrome and coronary atherosclerosis. (Tr. at 779.) Due to these impairments, Dr. Chattin opined she could stand or walk about 2 hours total, but without interruption, less than 1 hour. (Tr. at 780.) Claimant also could sit "1 hour at most" without interruption. (Id.) He opined Claimant could never climb or balance due to her panic disorder and anxiety disorder; she could occasionally stoop, crouch, kneel and crawl. (Id.) Dr. Chattin opined that Claimant's impairments affected her abilities to handle, feel, and push/pull; panic and anxiety disorder restrict her from heights; and her physical

17

impairments restrict her from moving machinery, temperature extremes, chemicals, noise, fumes, and vibration. (Tr. at 781.) Finally, Dr. Chattin stated that "[s]he has IBS and chronic recurrent diarrhea, and pain and misses a lot of work due [to] GI problems." (Tr. at 782.)

Dr. Walker provided both physical and mental assessments dated May 1, 2015; his physical assessment was nearly identical to Dr. Chattin's assessment except he opined that Claimant should also never crawl. (Tr. at 784.) Further, Dr. Walker's additional medical findings in support of his assessment was that Claimant is at "risk[] for heart attack", plus angina and shortness of breath. (Tr. at 785.) Similarly, Dr. Walker's mental assessment for Claimant's ability to do work-related activities mirrored Dr. Chattin's assessment, though Dr. Walker also opined Claimant had poor capability of functioning independently. (Tr. at 788.)

State Agency Medical and Psychological Consultants:

On November 5, 2014 at the initial level of review, Dr. Ann Logan reviewed the evidence of record and opined that Claimant's medically determinable impairments, anxiety and depression, were not severe. (Tr. at 103, 114.) Dr. Thomas Lauderman reviewed the evidence, and opined that Claimant was capable of medium exertional level work (Tr. at 105, 116.) and that she was capable of performing her past relevant work as a receptionist as it was actually performed. (Tr. at 106, 117.) On March 10, 2015, upon the reconsideration level of review, Dr. James Bartee affirmed Dr. Logan's opinion. (Tr. at 126, 137.) Dr. Bartee explained, given Claimant's normal mental status examinations by primary care physicians, as well as Ms. Robinson's report, the record suggested "no more than some mild deficits in the key functional domains." (Id.) Dr. Tarun Ray affirmed Dr. Lauderman's RFC assessment (Tr. at 125, 136.) and his opinion that Claimant could perform her past relevant work as a receptionist. (Tr. at 127-128, 138-139.)

State Agency Psychological Examiner:

On October 22, 2014, Kelly Robinson, M.A. performed a psychological evaluation on Claimant and issued her report on her findings. (Tr. at 489-493.) Ms. Robinson observed Claimant to be casually dressed with good grooming and personal hygiene; she walked with a normal gait, and maintained a normal posture and appeared to have good use of all limbs. (Tr. at 489.) Claimant drove herself to the interview unaccompanied. (Id.) Claimant reported worsening health and depression as well as "unexpected fearful episodes characterized by breathing difficulty, sweating, crying spells, heart palpitations, shakiness, dizziness, chest pressure, feeling of nervousness and a feeling of losing control" that are precipitated by stress. (Tr. at 489-490.) Claimant's reported daily activities consisted of going to bed at 12:30 am and arising at 9:30 am to feed her animals. (Tr. at 492.) She reported that it took her about two hours before she can function "really good" will go to her sister's for a while, and then return home to read, watch television, paint some if she felt like it, and spend the evening with her niece when she returns from school. (Id.) Ms. Robinson assessed Claimant's social functioning and concentration, persistence, and pace were all within normal limits. (Tr. at 492-493.)

Based on her interview, Ms. Robinson diagnostic impressions included persistent depressive disorder with intermittent major depressive episodes, currently moderate, and panic disorder. (Tr. at 492.) She gave Claimant a fair prognosis. (Tr. at 493.)

**The Administrative Hearing**

Medical Expert ("ME") Dr. Robert B. Sklaroff Testimony:

After his recitation of the evidence relating to Claimant's medical status (Tr. at 46-49.), Dr. Sklaroff acknowledged that she has a lot of GI issues (Tr. at 47.), however he did not "see anything

here diagnostically that meets or equals any of the listings, individually and or in the aggregate."
(Tr. at 50.) Based on his review of the record, Dr. Sklaroff opined that Claimant's RFC is "normal."
(Id.) He saw no reason for the environmental restrictions as opined by other State agency medical
consultants, however, and no "psych issues". (Tr. at 50-51.) Dr. Sklaroff opined that despite
Claimant's weight loss, unless there was muscle wasting, there would be no legitimate issue about
fatigue or stamina. (Tr. at 52.)

Responding to questions from Claimant's representative, Dr. Sklaroff affirmed that the
records did not support an objective finding of radiculopathy. (Id.) Further, Dr. Sklaroff testified
that Claimant's positive straight leg raising test had to be corroborated by more specific findings.
(Tr. at 53.) Dr. Sklaroff confirmed that "there's very little on physical exam . . . jumps right from
vital signs to assessment" and although "decreased sensation, sensory, in the right lateral thigh and
upper calf", it "didn't fit with much of anything else so therefore I sort of ignored it." (Tr. at 54.)
Dr. Sklaroff explained that Dr. Walker's noting Claimant's positive straight leg raising on the right
and painful range of motion findings can be a muscle spasm (Tr. at 54-55.) and could mean "some
irritation to the nerve potentially", but "it's too non-specific to yield a particular diagnosis." (Tr.
at 55.) Dr. Sklaroff further explained that is illustrated by the fact there is not much of a specific
diagnosis from that finding in the progress note. (Id.) In short, Dr. Sklaroff opined that the
radiculopathy must have not just sensory, but "motor if you're going to try to hit 104(A)." (Tr. at
56.)

Dr. Sklaroff testified that Claimant's pain did not necessarily affect her ability to function
and that pain medication would resolve the pain and she would not have many psychological
issues. (Id.) However, Dr. Sklaroff agreed that the record supported the fact that Claimant suffered

from stomach pain on a regular basis, but she did not have this pain on a consistent basis. (Tr. at 57.) Dr. Sklaroff testified that Claimant's abdominal pain was not recorded as being from a particular ailment, whether the colitis, the duodenitis, or the duodenal ulcers. (Tr. at 58.) Like her complaints of pain, Dr. Sklaroff testified that her complaints of diarrhea are not reported in every record, indicating that she has episodes that are treated with titrates or Lomotil and Imodium. (Tr. at 58-59.)

Pam Damron Testimony:

Claimant's sister, Ms. Damron testified that she sees Claimant every day and she lived in a trailer in her back yard until she had to sell it and now lives in the house with her. (Tr. at 62-63.) Ms. Damron stated that Claimant is sick every day and that she does "just about everything for her." (Tr. at 62, 64.) Ms. Damron testified that Claimant "lays in the bed probably half of the day." (Tr. at 64.) Ms. Damron testified that until she gets her medication refilled, Claimant is in the bed the whole time. (Tr. at 65.) Ms. Damron stated that she personally does most everything around the house, and Claimant may try to clean or something not too strenuous, but she cannot because she is "just weak all the time." (Tr. at 69-70.) Ms. Damron will take Claimant to her doctor appointments, but does not go into the office with her. (Tr. at 70.)

Ms. Damron opined that Claimant could not even work a low pressure or easy job because she would be in the bathroom most of the time, maybe four to five hours out of an eight-hour workday. (Tr. at 65-66.) Ms. Damron feeds Claimant two meals a day, plus snacks, but as soon as Claimant eats, she runs to the bathroom. (Tr. at 66.)

Before Claimant quit working, Ms. Damron testified that she never missed a day at work, but over time, she missed more and more work because she was sick. (Tr. at 63.) She was worried

21

she would be fired because she could not stay at work; she spent too much time in the bathroom or her head hurt badly. (Tr. at 63-64.) Over the last two or three years, Claimant would miss one or two days per week of work, then it gradually became worse to the point when she stopped working altogether. (Tr. at 66-67.) Claimant would have to leave work early or just miss, sometimes seven to eight days per month right before she quit working. (Tr. at 71.) Claimant missed work due to diarrhea and it made her weak; she would sometimes lay in bed for days because of it. (Tr. at 67.)

Ms. Damron stated that Claimant experiences a lot of migraine headaches as well as panic attacks. (Id.) She observed Claimant during a panic attack, where she would hold her chest and claim she could not breathe; Ms. Damron testified that Claimant probably has panic attacks five to six days in a week. (Tr. at 68.) Claimant has migraine headaches every day, but more severe migraines about four times a month. (Tr. at 68-69.)

Ms. Damron testified that Claimant's condition has been like this even before June 2014. (Tr. at 70.)

Claimant Testimony:

Claimant testified that around her alleged onset date she weighed 135 or 140 (Tr. at 73.) but by the time of the hearing, she weighed 105 or 110 pounds. (Tr. at 72.) She testified that when she gets up in the morning, it takes her two or three hours for her stomach to settle before she can take her medicine; during this time she usually is just sitting on the couch or lying in bed. (Tr. at 75.)

Claimant takes care of her personal hygiene, can fix simple meals and on her better days, she will try help dust or something. (Tr. at 76.) She can dress herself for the most part, and she had to have help with showering because she was so weak, but using a shower chair has helped her.

(Tr. at 84.) She goes grocery shopping twice a month with her sister, and cannot be in the store long, about thirty minutes. (Id.) Usually during the day, she just sits on the couch or in the kitchen and talks to her sister. (Tr. at 75.) For spare activities, Claimant testified that she watches television, preferring home improvement shows. (Tr. at 77.) She will lose track of the shows sometimes, although they interest her. (Id.)

Claimant testified that she does not sleep well at all, getting maybe three or four hours of continuous sleep, though she takes naps when she is having a "really bad" day. (Id.) She estimated that she can sit for sometimes 30 minutes to an hour, but will have to walk for about five to ten minutes in order to stretch because her right foot goes numb. (Tr. at 78.) She estimated that she could stand in place for maybe 15 minutes, or walk around for 15 to 30 minutes. (Id.) She testified that she has no physical strength whatsoever, and cannot lift her 40-pound great nephew. (Id.) She has weakness all the time and feels like she could collapse in a heap on the floor daily. (Tr. at 83-84.)

Claimant testified that pain in her stomach, back and hands interfere with her ability to work. (Tr. at 79.) She testified that her stomach pain "never stops" that she rated at a level "5" to "7" on a scale of 1 to 10. (Tr. at 79-81.) She claimed that it remained at that level of intensity "24 hours" a day. (Tr. at 81.) Claimant also claimed that she needed to use the restroom 15 to 20 times in an 8-hour period, with each visit lasting 30 minutes, because "I usually get sick when I'm in there". (Tr. at 82.) She stated that she is in the bathroom all the time, and that Imodium does not work to control her diarrhea. (Tr. at 83.)

Claimant testified that she has not been sensitive to some medications where she had to stop, but if she misses just one day it is really bad, although she does not think she experiences any

major side effects. (Id.) She has not had surgery for her GI issues, and her doctor wanted her to try medication first. (Tr. at 84.)

Although insurance has not covered a carpal tunnel test, Claimant testified that she experiences numbness in both hands every morning; she has difficulty grasping and holding objects. (Tr. at 85.) She can write with a pen occasionally, but not all day. (Tr. at 85-86.) Claimant testified that she also has hearing loss in her right ear because osteoporosis deteriorated the bones in her ear. (Tr. at 86.) She testified that she went to a doctor in Charleston about it, but was told a hearing aid would not help. (Tr. at 87.) Claimant testified that her hearing loss affected her ability to do her receptionist job "[i]n some way", but she would put the headset in her left ear.[8] (Id.)

Claimant confirmed that Dr. James Walker is her treating doctor and has been for about a year and a half. (Tr. at 88.) Before him, Dr. Chattin was her treating doctor; she had to change physicians due to insurance. (Tr. at 89.)

William L. Tanzey, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's prior work history as a receptionist is characterized as sedentary, unskilled, entry level. (Tr. at 90.) Given the hypothetical of an individual of Claimant's age at the alleged onset date and current age, education level, vocational profile, limited to no more than medium work, and restricted from ladders, ropes, scaffolding, heights, moving machinery and hazards, with frequent exposure to hot and cold temperature extremes, fumes, odors, dust, and would be afflicted with chronic pain to herself at all times, but able to maintain attention and concentration for two hour increments with normal morning, lunch and afternoon breaks, the VE

---

[8] The ALJ voiced his concern about the lack of records related to Claimant's hearing loss even though she performed her work for fourteen years without it being a problem, however, her representative wanted to "get a result today" and not delay the matter further to obtain those records. (Tr. at 86-88, 95.)

opined that the individual could perform her last job as well as other jobs, such as hand packer, inspector, and dry cleaner helper at the medium level. (Tr. at 90-91.) The VE also testified that the individual could perform light work, such as price marker, cashier, and garment folder (Tr. at 91.) However, if the individual would be off task 25 percent of the time due to pain, going to the bathroom, having migraines or other symptoms, the VE opined that would eliminate all those jobs. (Tr. at 92.) When presented with the restrictions found by Dr. Chattin, the VE opined that the individual could not perform even sedentary jobs. (Tr. at 94.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

Evaluating Opinion Evidence:

As stated previously, Claimant argues that the ALJ committed reversible error when he did not give her treating physicians' opinions controlling weight during his analysis. In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other

26

factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

In this case, the ALJ acknowledged that Claimant received treatment for mental impairments as well as physical impairments from her "primary healthcare provider", with references to the treatment records from Drs. Chattin and Walker. (Tr. at 21, 27.) The ALJ noted that Claimant made "numerous visits to her treating physicians for treatment of other conditions", which included headaches, digestive issues, mental health issues, musculoskeletal issues, and others. (Tr. at 27.) Ostensibly, the ALJ was very aware of the treatment relationship between Claimant and Drs. Chattin and Walker, that she sought treatment from them frequently, for "well over a year and a half." (Id.) As both doctors treated her for myriad of health issues, it is clear that they were not specialists. For example, when the ALJ gave "little weight" to their opinions regarding Claimant's "non-severe mental impairments" he specifically mentioned "these opinions appear to rest at least in part on an assessment of impairments outside the doctors' area of expertise (Exhibits 20F-21F)." (Tr. at 21.)

The ALJ also noted that Claimant's treating physicians' 2015 opinions about Claimant's mental impairments were inconsistent with the medical evidence: although "the record shows the claimant was assessed with depressive disorder and panic disorder (Exhibit 4F)", the "mental status evaluation was essentially normal other than moderate limitations in recent memory." (Id.) The ALJ further noted that the evaluation provided by psychological consultative examiner Kelly Robinson, M.A. indicated Claimant's thought process was logical and coherent and determined Claimant's social functioning, immediate and remote memories, concentration persistence, and pace were all

within normal limits. (Tr. at 21-22.) In addition, the ALJ noted the internal inconsistencies between Claimant's treating physicians' opinions and their own records: "[t]reatment records from the claimant's primary health care provider reveal no significant complaints regarding depression or anxiety (Exhibits 11F and 15F)." (Id.) All of the aforementioned illustrated the ALJ's compliance with the Regulations when he gave Claimant's treating physicians' opinions "little weight" with respect to her non-severe mental impairments.

With regard to Claimant's physical impairments, which represent the gravamen of her disability claims, the ALJ again acknowledged the opinion evidence from Claimant's treating physicians, Drs. Chattin and Walker. (Tr. at 28.) Both opinions relegated Claimant "to sedentary exertion with certain postural, manipulative, and environmental limitations." (Id.) Again, "little weight" was given to these opinions "based on the inconsistency with the evidence of record" for which the ALJ cited several instances from the record: an "MRI demonstrated bilateral facet hypertrophic joint changes at L5-S1 (Exhibits 3F, 6F-7F, and 10F-11F)"; despite "tenderness of the lower back and spine, there was normal tone and motor strength"; Claimant's "cranial nerves and sensation were grossly intact, deep tendon reflexes were 2+ bilaterally throughout, and coordination was intact"; and Claimant "remained neurologically intact throughout the record." (Id.) The ALJ references these specific records as illustrations of the internal inconsistencies between Claimant's treating physicians' opinions of Claimant's capacities and their own treatment records. Prior to this analysis, the ALJ went through what criteria is necessary to meet or equal the Listings given all of Claimant's alleged physical impairments, for which he found no evidence to support a Listing. (Tr. at 23-25.)

Next, the ALJ discussed the testimonial evidence provided during the hearing by medical

expert Dr. Sklaroff in support of the ALJ's evaluation of Claimant's treating physicians' opinion evidence: specifically, the ALJ noted Dr. Sklaroff's opinion that there was "no objective of radiculopathy" with respect to Claimant's lumbar disc disease, and that the Listings "require that radiculopathy must entail not only a sensory, but also a motor component." (<u>Id</u>.) Moreover, the ALJ acknowledged that Dr. Sklaroff conceded a positive straight leg raise test, but it lacked the corroboration of additional testing/findings. (<u>Id</u>.) Notably, Dr. Sklaroff opined Claimant's impairments did not meet or equal a Listing. (<u>Id</u>.) Finally, the ALJ recognized Dr. Sklaroff's conclusion that Claimant could lift/carry 50 pounds occasionally, 25 pounds frequently, and is able to sit, stand and walk six hours in an eight-hour workday, but never climb ladders, ropes or scaffolds and should avoid heights. (<u>Id</u>.) With respect to the State agency medical consultants, the ALJ noted their opinions that Claimant could perform medium work with certain environmental limitations. (<u>Id</u>.)

In sum, the ALJ gave the opinions of Dr. Sklaroff and the State agency medical consultants "great weight" due to the "general consistency with the evidence of record", however, the ALJ did not fully adopt their opinions, insofar as he found evidence supporting "additional postural and environmental limitations in the [RFC]." (<u>Id</u>.) The ALJ stated "[s]pecifically, treatment records reveal complaints of shortness of breath, with a finding of wheezing on examination at times (Exhibits 3F and 5F-7F)", further, Claimant's exhibition of tenderness in her lower back coupled with the positive straight leg rest also contributed to the ALJ's finding for additional restrictions in his RFC assessment. (<u>Id</u>.)

In summation, the ALJ gave a thorough analysis and provided "good reasons" for discounting the opinion evidence from Drs. Chattin and Walker, with respect to their medical source

statements concerning Claimant's capacity to work with both her mental and physical impairments. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's treating physician opinion evidence is supported by substantial evidence.

Duty to Develop Record:

Claimant's next assignment of error is twofold: that the ALJ failed to "make a proper record" and gave "controlling weight" to the opinion of a "reviewing doctor", Dr. Sklaroff. (Document No. 11 at 3.) In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment. Id. §§ 404.1512(c), 416.912(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant,

30

who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as a claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8ᵗʰ Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4ᵗʰ Cir. 1976).

In this case, the undersigned notes that the ALJ specifically asked Claimant's attorney if he wanted to delay the proceedings in order to obtain additional medical records in support of her claims, however, Claimant's representative declined to do so. (Tr. at 42, 86-88, 95.) Moreover, in order to allow for the additional submission of evidence, the ALJ gave Claimant an additional 48 hours to upload the RFC findings by Claimant's treating physicians. (Tr. at 95.), and Claimant's representative took advantage of the extra time and submitted records for the ALJ's review and consideration. (Tr. at 18, 776-789.) In short, the ALJ did not fail to "make a proper record".

With respect to Claimant's argument that the ALJ gave Dr. Sklaroff or any other non-treating physician of record "controlling weight", the written decision shows that no opinion enjoyed controlling weight. Claimant also contends that the ALJ gave greater weight to Dr. Sklaroff's opinion despite the fact that he "ignored" some of the objective test results in formulating his conclusions. (Document No. 11 at 3.) However, the transcript from the administrative hearing as well as the ALJ's decision explains why Dr. Sklaroff did not credit the

positive straight leg raising tests evidence: it was not corroborated by a "motor component". (Tr. at 28, 56.) In fact, the ALJ actually gave more credit to the evidence that Claimant "exhibited tenderness of the lower back and spine, *as well as positive straight leg raise test on examination*". (Tr. at 28.) (emphasis added) Therefore, the undersigned **FINDS** Claimant's arguments that non-treating physicians received controlling weight and that such weight was given in spite of ignoring objective evidence lack merit.

The RFC Assessment:

Claimant also takes issue with the ALJ's omission of the limitations he "stipulated" to as found by her treating physicians when questioning the VE, which ultimately determined the RFC. (Document No. 11 at 3-4.) Residual functional capacity represents the *most* that an individual can do despite her limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, the ALJ did not actually stipulate to the limitations recommended by Claimant's treating physicians, but only stipulated as to what a vocational expert would opine if

confronted with such limitations. Nevertheless, as discussed above, the ALJ explained why he gave less than controlling weight to Drs. Chattin and Walker and gave more credence to the opinions provided by Dr. Sklaroff and State agency consultants. Essentially, Claimant argues that her treating physicians support greater limitations than those found by the ALJ, and the greater limitations should have been adopted, however, in order for this Court to do so would necessitate a re-weighing of the conflicting evidence, which is beyond the scope of this judicial review. See Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). In accordance with this Court's duty to scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities were "rational" and based upon substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

Determining Severe Impairment:

Another of Claimant's alleged errors is that the ALJ failed to find her mental impairments severe, and that she had not sought psychological treatment. (Document No. 11 at 5.) A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Id. §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1521(b), 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id.

Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ expressly found that Claimant's mental impairment was "non-severe" based on both the DDS examiner's findings as well as her own treating physicians' treatment notes. (Tr. at 21.) The ALJ also found that the evidence supported no more than mild limitations in any of the first three functional areas and none in the fourth area. (Tr. at 22.) Contrary to Claimant's argument that Dr. Ann Logan found Claimant's mental impairments "severe", the record clearly shows that she found Claimant's medically determinable impairments "not severe" (Tr. at 103.), accordingly, the undersigned **FINDS** that Claimant's argument on this issue lacks merit.

Claimant also contends that the ALJ's finding "there is no evidence in the available medical records to indicate the claimant sought psychological treatment" is factual error. (Tr. at 21, Document No. 11 at 5.) The Commissioner points out that the ALJ was referring to specialized psychological treatment, because he just cited her treatment records concerning her mental status evaluations before he made this statement. (Document No. 12 at 12.) The undersigned agrees with the Commissioner's interpretation because the written decision includes the ALJ's review of Claimant's mental health treatment records, her treating physicians' opinions with respect to Claimant's mental capabilities, as well as the psychological evaluation provided by DDS examiner, Ms. Robinson. (Tr. at 21.) Moreover, the ALJ went on to perform the special technique required under the Regulations when a claimant alleges a mental impairment. (Tr. at 22-23.) Accordingly, the undersigned **FINDS** the decision determining Claimant's mental impairment was non-severe is

based upon substantial evidence.

    <u>Evaluation of Symptoms in Disability Claims:</u>

    Lastly, Claimant argued that the ALJ improperly considered her "credibility" because her allegations were corroborated by her treating physicians' opinions. (Document No. 11 at 6.) Social Security Ruling 16-3p[9] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can be reasonably be accepted as consistent with the objective medical evidence and other evidence; explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

    The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. <u>See</u>, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports

---

[9] Ruling 16-3p superseded SSR 96-7p, effective March 28, 2016, and therefore governed the ALJ's decision herein. <u>See</u>, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." <u>See</u>, 2016 WL 1119029, at *1.

from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

After properly performing the two-step process[10], the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they were not "entirely consistent with the medical evidence and other evidence in the record." (Tr. at 26.)

The ALJ first noted that the objective evidence of record was inconsistent with Claimant's allegations of her symptoms: she had breathing difficulties and sinusitis at times, but her inhaler helped these symptoms; when she was found to be wheezing, she was out of medication; she continued to smoke; the pulmonary function study was normal; the record consistently indicated clear breath sounds; Claimant's history of osteoarthritis/degenerative joint disease and rheumatism with complaints of lower back pain with right sciatica at times and joint pain was inconsistent with the MRI studies; despite lower back tenderness, she had normal tone and motor strength; she had normal gait and station; her cranial nerves and sensation were grossly intact; with respect to the positive straight leg raise test, "the claimant consistently remained neurologically intact throughout the record (Exhibit 10F-11F)"; and Claimant advised she did well if she took her pain medication. (Tr. at 26-27.)

With respect to Claimant's headaches, the ALJ noted there was no evidence of complaints since her alleged onset date, although she had numerous visits to her treating physicians for other

---

[10] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

conditions; her recent medication list shows no prescriptions for headache medication; and her treatment records are inconsistent with her allegations of having a migraine once a week. (Tr. at 27.) Regarding Claimant's gastrointestinal issues, the records corroborate her complaints of abdominal pain, nausea, vomiting and chronic diarrhea, however, the ALJ found her testimony of experiencing diarrhea 15-20 times per day were inconsistent with her treating gastroenterologist's records indicating only three or four days per week, as well as nausea, and that medication helped with the nausea. (Id.) Her erosive gastritis, duodenal ulcer, and hiatal hernia were treated with Nexium. (Id.) Claimant's treating physician's records also did not support her allegations of such frequent diarrhea, and there were no acute findings from a CT scan of her abdomen. (Id.)

The ALJ next explored "other evidence" that failed to support Claimant's allegations: her daily activities were not as circumscribed to the extent of her disabling symptoms and limitations, including personal care, meal preparation, doing dishes, helping around the house, occasional grocery shopping; feeding her animals; and doing laundry. (Tr. at 27-28.) In addition, the ALJ reviewed the opinion evidence of record, including those provided by Drs. Chattin and Walker, Dr. Sklaroff and State agency medical consultants, as discussed *supra*. (Tr. at 28.) The ALJ also considered Claimant's sister's testimony with respect to Claimant's functional limitations, acknowledging that Ms. Damron's opinion is a "lay opinion based upon casual observation", and "potentially influence by loyalties of family." (Tr. at 26.)

In sum, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct

application of the relevant law. <u>See</u>, <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1995). The undersigned **FINDS** the ALJ's discussion of the objective and other evidence of record in his evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that Claimant's statements were inconsistent with the evidence of record complied with the applicable law, and further, is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's motion for judgment on the pleadings (Document No. 11.), **GRANT** the Defendant's request to affirm the decision below (Document No. 12.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 7, 2017.

Omar J. Aboulhosn
United States Magistrate Judge